NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
## DIVISION ONE

STATE OF ARIZONA, *Appellee,*

*v.*

AMADOU YACOUB DIAKHATE, *Appellant.*

No. 1 CA-CR 25-0328

FILED 06-24-2026

Appeal from the Superior Court in Mohave County
No. CR-2024-00623
The Honorable Derek C. Carlisle, Judge

**AFFIRMED**

COUNSEL

Arizona Attorney General's Office, Phoenix
By Michael J. Woodburn
*Counsel for Appellee*

Jill L. Evans, Attorney at Law, Flagstaff
By Jill L. Evans
*Counsel for Appellant*

---

**MEMORANDUM DECISION**

Presiding Judge Daniel J. Kiley delivered the decision of the Court, in which Judge D. Steven Williams and Judge Cynthia J. Bailey joined.

---

**K I L E Y**, Judge:

¶1        Amadou Yacoub Diakhate appeals his convictions and sentences for aggravated driving while impaired to the slightest degree ("aggravated DUI"), endangerment, and possession of drug paraphernalia ("PODP"). Because he fails to establish error, we affirm.

## FACTS AND PROCEDURAL HISTORY

¶2        This case arose out of a "road rage" incident in the area of milepost 64 of Interstate 40 on August 8, 2023. Viewed in the light most favorable to upholding the conviction, *State v. Griffin*, 250 Ariz. 651, 653, ¶ 2 (App. 2021), the evidence shows that Robert[1] was driving in his Subaru on Interstate 40 toward Kingman, traveling in the right-hand lane, when he noticed a white Mazda driving alongside him at the same speed in the left-hand lane. As Robert later stated, he "could tell" that the driver of the Mazda was "irritated at me[,]" although he did not know why. Upon realizing that the driver of the Mazda was "upset[,]" Robert tried to put distance between the two vehicles by slowing down, expecting the Mazda to maintain its speed and drive away.

¶3        After driving ahead of Robert's decelerating Subaru, the Mazda suddenly pulled off the highway onto the right-hand shoulder and stopped. "[N]ervous" that the Mazda would begin to "follow" him if he passed it, Robert pulled his Subaru onto the shoulder about "a football field or so" behind the Mazda and then "kind of waited to see what was gonna [*sic*] happen." Robert watched as the Mazda's driver, "a very tall African American" man later identified as Diakhate, "got out of" the car and began "waving his arms in the air[.]" After "maybe 30 seconds," the man got back in the Mazda, "turn[ed] his vehicle around" so it was facing the wrong direction, and "started to drive" toward Robert's Subaru. Alarmed at seeing the Mazda "coming for me," Robert called 911 while he pulled back "onto

---

[1] We use a pseudonym to protect the victim's identity. *See* Ariz. R. Crim. P. 31.10(f).

the freeway[,]" "dart[ed]" over "to the fast lane," and drove past the Mazda. As Robert later testified, the Mazda turned around again and started "following me down the freeway." Although Robert continued to "accelerate[] . . . all the way up to . . . 100 miles an hour[,]" the Mazda "kept closing in on" the Subaru. Fearing for his safety, Robert pulled off at the next exit and headed toward a gas station, hoping that the presence of other people would deter the Mazda's driver from continuing his pursuit of the Subaru. Instead, the Mazda followed the Subaru to the gas station. In an effort to "kill time" until police arrived in response to his 911 call, Robert drove "around in circles in the gas station parking lot" while the Mazda "follow[ed]" behind and its driver yelled threats to "kill" Robert. After "maybe five minutes or something," Department of Public Safety ("DPS") Trooper Clark entered the parking lot in a marked DPS vehicle. The Mazda then "left the parking lot and got back on the freeway."

¶4        Robert later testified that his Subaru had a dash-cam that records video in "one-minute segments." When Trooper Clark contacted him in the gas station parking lot, he gave Clark the memory card from the dash-cam. Clark took the memory card and "entered" the videos it recorded "into [the] computer" of his DPS vehicle and watched them. Clark then passed along the information he had learned.

¶5        After receiving a report of the road rage incident, Trooper Cooney stopped a white Mazda traveling westbound on I-40 at milepost 50. He approached the Mazda and spoke with the driver, Diakhate, who identified himself and acknowledged having been "involved in an incident with another vehicle." Cooney observed that Diakhate seemed "animated" and moved "a lot . . . as he spoke." Trooper Turriff soon arrived at the scene and joined in the conversation. By now, Diakhate had gotten out of the Mazda. Turriff, a certified drug recognition expert, noted that Diakhate seemed "very amped up," explaining that Diakhate was "constantly moving back and forth" and would "crouch[] down" before "standing up" and "throwing his arms completely out[.]" Turriff later testified, "agitation" and "exaggerated movements" are "indicators" of methamphetamine use.

¶6        After speaking with Diakhate, the troopers placed him under arrest, and Trooper Turriff conducted an inventory of the Mazda before it was towed to an impound lot. In the car's center console, Turriff found a bong used to smoke methamphetamine; the bong had "burn marks" on the bottom and "black burned residue" inside.

¶7        Trooper Turriff transported Diakhate to the Kingman DPS substation, where he administered field sobriety tests ("FSTs"). Among

other FSTs, the trooper administered the "walk and turn" test, which required Diakhate to take nine heel-to-toe steps along a white line painted on the pavement of the parking lot. Diakhate performed the test poorly, taking too many steps while holding his arms "out" to "maintain his balance" in disregard of instructions to keep his arms at his sides. After unsuccessfully performing two more FSTs, Diakhate refused to participate any further, complaining of hip pain and stating that he had only slept two hours in the preceding two days.

¶8        Because Diakhate refused consent to a blood test, DPS obtained a search warrant to draw his blood. The phlebotomist later noted that Diakhate was "[p]retty agitated" at the time, and began "screaming . . . God is great . . . over and over" during the blood draw. The sample was later tested and found to contain methamphetamine.

¶9        The State charged Diakhate with aggravated DUI, a class 4 felony in violation of A.R.S. §§ 28-1381(A)(1), -1383(A)(5); endangerment, a class 1 misdemeanor in violation of A.R.S. § 13-1201; possession of a dangerous drug ("PODD"), a class 4 felony in violation of A.R.S. § 13-3407(A)(1); and PODP, a class 6 felony in violation of A.R.S. § 13-3415. The PODD charge was dismissed before trial.

¶10       A three-day jury trial began in May 2025. The State presented the testimony of Robert as well as various law enforcement officials and criminalists.

¶11       The troopers who interacted with Diakhate at the scene described him acting "animated," "amped up," and "agitated." The phlebotomist who took Diakhate's blood likewise testified about Diakhate's agitated state. Trooper Turriff testified, based on his training and experience as a "drug recognition expert," that Diakhate's poor performance on the FSTs was "a sign of impairment." Referencing Diakhate's statement that he had slept only two hours in the preceding two days, Turriff also testified that "staying up for long periods of time" is "an effect methamphetamine can have[.]"

¶12       The State also presented body cam video of the troopers' interactions with Diakhate as well as 22 video clips from Robert's dash-cam. Although most of the video clips were of a one-minute duration, two of them were only about thirty seconds each.

¶13       The forensic toxicologist testified that methamphetamine is a stimulant and that people under its influence may exhibit "hyperactivity." Further, he stated, methamphetamine use was associated with impulsive

behavior, stating that users "can be quick to make decisions" that are "often . . . wrong," or at least "the wrong ones to make while driving or operating a vehicle." As the methamphetamine wears off, the toxicologist went on, users often become "agitated" and "irritable." He further testified that methamphetamine is typically detectable for four to eight hours after use.

¶14            Diakhate testified in his own defense. He stated that he was driving to Las Vegas when a "small S.U.V." cut him off. He "wasn't upset at that moment[,]" however, and instead gave the other driver a "thumbs up." Without responding to his friendly gesture, the other driver pulled over and stopped. "Concerned" for the other driver's well-being, Diakhate pulled off the freeway, too. He stepped out of his car and called out, "You okay?" Receiving no response, he decided to "get close" to the other vehicle to determine if the driver was in need of help. He made a U-turn and drove toward the other vehicle. Only when the other vehicle drove off, Diakhate stated, did he become upset. He admitted following the vehicle in his Mazda, explaining, rather confusingly, that he had come to the conclusion that the driver must have been "someone I know" and he wanted to determine who it was. By the time they reached the gas station parking lot, Diakhate acknowledged, he was mad. He admitted that he yelled "the F word" and said he would "kill" the driver, but insisted that he had "no intention to harm" him. He then left the parking lot, he stated, because he had other, "more important" things to do.

¶15            Diakhate denied using methamphetamine. When asked to explain the presence of the bong in his car, he stated that it had been left there the day before, without his knowledge, by a "homeless lady" whom he "used to help[.]" He denied refusing to submit to a drug test, insisting that he offered to undergo a urine test instead of a blood test. He further attributed his poor performance on the FSTs to "a sciatic nerve problem[.]"

¶16            Noting that two of the dash-cam video clips were each half as long as the others, defense counsel alleged that some of the video of the incident must have been deleted and so requested a *Willits* instruction. The court denied the request.

¶17            The jury found Diakhate guilty as charged. After designating the PDOP conviction a misdemeanor, the superior court sentenced Diakhate to the presumptive term of 1.5 years in prison for aggravated DUI and 3 days in jail for the remaining counts, with credit for time served.

¶18            Diakhate timely appealed. We have jurisdiction pursuant to Article 6, Section 9, of the Arizona Constitution and A.R.S. §§ 12-120.21, 13-4031, and 13-4033(A).

## DISCUSSION

I.    **Sufficient evidence supports Diakhate's aggravated DUI conviction.**

¶19            Diakhate contends that the evidence was insufficient to support his aggravated DUI conviction. As charged in this case, a conviction for aggravated DUI requires proof that the defendant "[drove] the wrong way on a highway" while "under the influence of . . . any drug . . . if the person [was] impaired to the slightest degree." A.R.S. §§ 28-1381(A)(1), -1383(A)(5). Diakhate does not dispute that he drove the wrong way on a highway, nor does he dispute that the State "presented evidence of methamphetamine in his system[.]" He asserts, however, that the State presented no evidence that he was impaired while driving.

¶20            Evidence is sufficient to support a conviction "if a rational trier of fact could have found[,]" from the evidence presented, "the elements of the offense beyond a reasonable doubt." *State v. Whalen*, 192 Ariz. 103, 111 (App. 1997). "To set aside a jury verdict for insufficient evidence[,] it must clearly appear that upon no hypothesis is there sufficient evidence to support the conclusion reached by the jury." *State v. Clark*, 249 Ariz. 528, 534, ¶ 21 (App. 2020) (citation modified). Stated differently, a reviewing court "will reverse a conviction for insufficient evidence only if there is a complete absence of probative facts to support the jury's conclusion." *Id.* (citation modified).

¶21            Here, ample evidence supports the jury's determination that Diakhate was impaired by the methamphetamine in his system. Robert's account of Diakhate's erratic driving, for example, constitutes evidence of his impairment. *See State v. Holguin*, No. 1 CA-CR 15-0836, 2016 WL 7093867 at *3, ¶ 23 (Ariz. App. Dec. 6, 2016) (mem. decision) (rejected defendant's challenge to sufficiency of evidence to support aggravated DUI conviction and noting that officer's testimony about defendant's "erratic driving . . . supports a finding of impairment"). Further, Robert, the troopers, and the phlebotomist all testified that Diakhate acted in an agitated and hyperactive manner during and immediately after the incident. As the forensic toxicologist testified, methamphetamine can cause users to exhibit such behavior. The phlebotomist also testified that users can become "irritable" as the methamphetamine is wearing off, and Diakhate's

own testimony about his angry reaction when the Subaru drove away as he approached it establishes his irritability at the time.

**¶22** The forensic toxicologist testified that methamphetamine can negatively affect users' judgment, leading them to make unwise choices. The jury heard Diakhate admit that he intentionally drove the wrong way on the freeway, and could reasonably consider this testimony as evidence of an unwise decision that supports a finding that his judgment was impaired at the time. Further, Trooper Turriff's testimony, and the body-cam video that the jurors were able to observe, established that Diakhate performed poorly on the FSTs, including by disregarding instructions to take nine steps while keeping his arms at his side during the walk-and-turn test. As Turriff testified, poor performance on FSTs, including the subject's inability to follow directions, constitutes an indicator of impairment. *See State v. Campoy*, 214 Ariz. 132, 134-35, ¶¶ 8-9 (App. 2006) (holding that a defendant's performance on FSTs, though not conclusive, is "relevant evidence of [the] defendant's impairment"); *see also State v. Aulbach*, No. 1 CA-CR 17-0014, 2018 WL 2355293 at *4, ¶ 15 (Ariz. App. May 24, 2018) (mem. decision) (holding that defendant's DUI conviction was supported by evidence that included drug recognition expert's testimony about "signs and symptoms of impairment" exhibited by defendant). All of this evidence, taken together, is more than sufficient to support Diakhate's conviction for aggravated DUI. *See State ex rel. McDougall v. Albrecht*, 168 Ariz. 128, 132 (App. 1991) (vacating order setting aside guilty verdict in DUI case; the defendant's "failure to stop at a red light and speeding coupled with his poor performance of the [FSTs] and physical signs of impairment constituted substantial evidence of impairment"). We therefore reject Diakhate's challenge to the sufficiency of the evidence.

II. **The court did not commit reversible error by denying Diakhate's request for a *Willits* instruction.**

**¶23** Noting that two of the video clips from Robert's dash-cam were shorter than the others, Diakhate maintains that video was missing which could have "corroborated" his testimony that he gave Robert the "thumbs up signal" and that he drove back toward Robert's car with benign intentions. The missing video, he contends, entitled him to a *Willits* instruction, which the court improperly refused to give.

**¶24** A *Willits* instruction tells the jurors that they may infer that evidence that the State lost or destroyed would have been exculpatory. *See State v. Willits*, 96 Ariz. 184, 191 (1964); *State v. Fulminante*, 193 Ariz. 485, 503, ¶ 62 (1999). To establish entitlement to a *Willits* instruction, the

defendant must show that: (1) the evidence existed, (2) the State destroyed or failed to preserve the evidence, (3) the evidence had a tendency to exonerate the defendant by being "potentially useful to a defense theory supported by the evidence[,]" and (4) the defendant was prejudiced. *State v. Togar*, 248 Ariz. 567, 575, ¶ 25 (App. 2020) (citation omitted). We review the denial of a *Willits* instruction for an abuse of discretion. *State v. Glissendorf*, 235 Ariz. 147, 150, ¶ 7 (2014).

**¶25** Diakhate points to nothing in the record showing that the purportedly missing portions of the video clips ever existed. Both Robert and Trooper Clark denied altering the clips in any manner. Absent evidence that the allegedly missing evidence actually existed, a *Willits* instruction was clearly unwarranted. *Togar*, 248 Ariz. at 575, ¶ 25.

**¶26** Further, even if video from Robert's dash-cam was taken and then deleted or otherwise lost, Diakhate fails to show how the failure to preserve those clips was attributable to the State. Any loss of video due to the malfunctioning of Robert's dash-cam or his mishandling of the equipment before he turned the memory card over to Trooper Clark would not justify a *Willits* instruction. *See State v. Young*, No. 2 CA-CR 2020-0087, 2021 WL 5542080 at *6, ¶ 24 (Ariz. App. Nov. 26, 2021) (mem. decision) (affirming trial court's denial of requested *Willits* instruction based on the purported loss of exculpatory recordings and messages on defendant's cell phone, in part because defendant did not explain how evidence was "destroyed or rendered unavailable to him as a result of" conduct by the State); *cf. State v. Gerhardt*, 161 Ariz. 410, 411, 413 (App. 1989) (defendant moved to dismiss DUI charge on due process grounds because his interaction with police after arrest was not videorecorded in its entirety as a result of "mechanical malfunction or human error while operating the video camera"; affirming denial of motion to dismiss, the Court held that "[t]here is nothing in the record to suggest that the blank spot on the videotapes is the result of the state's bad faith").

**¶27** Finally, even if the State could be faulted for the failure to preserve some of the video from Robert's dash-cam, Diakhate fails to establish that the missing video would have had a tendency to exonerate him. *See State v. Dunlap*, 187 Ariz. 441, 464 (App. 1996) (holding that trial court did not err in refusing to give *Willits* instruction based on purported removal of documents from police file; defendant's claim that "allegedly missing" documents "would have supported his theory of the case" was "entirely speculative" because documents' "contents" were "unknown"). Diakhate asserts that the missing video could have corroborated his testimony that he gave a "thumbs up" to Robert after Robert purportedly

cut him off. Evidence that he gave Robert a "thumbs up," however, would hardly exonerate Diakhate of the charged offenses. Such evidence would not explain or excuse Diakhate's erratic and reckless driving, the threats he yelled at Robert at the gas station, or the presence of a bong in the center console of his car. Because Diakhate has identified nothing that the purportedly missing video could have shown that would have exonerated him, the trial court committed no error in denying his request for a *Willits* instruction. *See Fulminante*, 193 Ariz. at 503, ¶ 62 ("A trial court does not abuse its discretion by denying a request for a *Willits* instruction when a defendant fails to establish that the lost evidence would have had a tendency to exonerate him."); *see also State v. Olivieri*, No. 2 CA-CR 2023-0226, 2025 WL 604765 at *4, 5, ¶¶ 20, 23 (Ariz. App. Feb. 25, 2025) (mem. decision) (defendant was charged with second-degree murder and other crimes based on shooting in parking lot that was partly captured on security video, but which contained "thirty-four seconds" of "unviewable" footage; holding that trial court did not err in denying request for *Willits* instruction because defendant offered nothing but "speculat[ion]" that "the missing footage contained exculpatory content").

## CONCLUSION

¶**28** We affirm.



MATTHEW J. MARTIN • Clerk of the Court
**FILED**: JR